May it please the Court, good morning. My name is Glenn Kulik. I am the attorney for the plaintiff and appellant in this case, Paula Petrella. My principal goal this morning is to try to convince this Court what I was unable to convince the trial judge, namely that Jake LaMotta is not James Bond. According to the respondents, they're the same. According to the respondents, this case is Dan Jack. There is no distinction between the two. There's no difference. Dan Jack is controlling. And in fact, the respondents contend that it was frivolous of us to even attempt to distinguish Dan Jack, so much so that they feel they're entitled to a recovery of their attorney's fees, either by statute or by virtue of their Rule 11 motion. Respectfully, we disagreed in the trial court, and we disagree now. This is, of course, an ob-end type case, something that Dan Jack was not. And to my knowledge, this is the first time that the Ninth Circuit, or any other court for that matter, has been required to apply the latches defense in the context of an ob-end type case, which by its very definition means at least two things. First, that 28 years must have passed between the date that the written work was first created and the time the lawsuit was filed. And second, the author of the written work must have died during that 28-year period of time. In terms of expectations-type damage, in Dan Jack, the court started its decision by arguing and stating that James Bond was a, quote, cultural phenomenon, unquote. Quote, one of the great commercial successes of the modern cinema, unquote. Quote, fast forward to 1997. By that time, Dan Jack had produced movie after movie, and James Bond had become a cinematic icon and a huge box office success, unquote. Indeed, between 1961 and 1997, when the lawsuit was filed, 18 highly successful James Bond movies had been produced. Well, I think we know, Jan, you're going to use up all your time talking about Dan Jack. Well, what I'm trying to do is distinguish Dan Jack from our situation here, Your Honor, which I think is very, very different. In this case, Raging Bull is a one-time movie over 30 years old. There's no evidence before the court there will ever be a sequel to Raging Bull, there will ever be any toys or cars or dolls or anything like that to merchandise. Well, whatever the point. I mean, the point is, your client is claiming an interest in the, what does exist, and there's a clear, long passage of time, what does not exist, when she brought notice of a potential claim and then didn't do anything about it for years and years and years. So, as the district court found, there were both evidentiary problems as well as expectation problems, so why don't you address those? Well, that's what I'm trying to address, Your Honor. Number one, on the subject of expectations-based prejudice, what I'm suggesting to the court is that there was no prejudice. In fact, the defendants, respondents, benefited and profited from the delay. Had this school filed ten years earlier- Excuse me, sorry to interrupt, this is Judge Fletcher. I take it as given that a fair amount of money was invested by the defendants after 1991, and also as given that they netted some money based on their investment, that is to say they made money. Precisely how much, I'm trying to reconcile the statement in the very short paragraph on 956 in Danjack, where it gets to the expectation privilege, excuse me, prejudice, how do you reconcile that statement and holding in Danjack with our holding and rationale in Grand Canyon Trust? Well- And you've got to get out from under this paragraph in Danjack. Yes, I have. What paragraph was that? Well, I'm on page 956, that is to say, 263, F3rd, 956. It's the paragraph that begins at the bottom of the first column and runs over to the top of the second column. The sentence that's particularly interesting to me is the last sentence of that paragraph, and I'll just read it. Given this fact, it would be inequitable to permit McClory to wait 40 years than to profit from the risk inherent in Danjack's investment in the franchise. That is to say, it's conceded, I gather, for the purpose of that statement, that in fact there was a lot of money made, so there was benefit. So your argument that there's benefit doesn't necessarily get you out from under Danjack, because that was the case in Danjack. I distinguish it on this basis. Had Mr. McClory assumed control of the James Bond franchise in 1997, he would have thereafter been the sole person entitled to make the future James Bond movies, which we all know up to the present date there have been many, and no doubt there will be many more in the future. So he will have piggybacked on all of the efforts and risks that the prior owner took. There is no evidence before this Court that there is any future appreciable value to Raging Bull. What I was trying to start off saying is that comparing the James Bond franchise, which the Court in Danjack noted is the most lucrative in movie history, worth billions of dollars... Let me ask you, because the time is running, let me ask, let me move on for another question that's related to this, and that is, what damages are you seeking? Are you simply seeking future profits, or are you seeking retroactive damages for the money that they've already made? Well, our principal desire here is to establish our ownership interest in the material. In terms of the monies that we're seeking to recover, it would be future monies, if any, that's generated by Raging Bull. And I don't think there's any evidence before the Court that there will be any or anything significant. To the extent we can go back three years in terms of statute of limitations, that's not the primary motivation of our case. It's there, it is available legally if the case continues, but it's not the primary motivation of our case. Okay, but then finally on this sentence, the sentence that I just read you, then to profit from the risk inherent in Danjack's investment. Focusing on that word risk, beginning in 1991, we now, the film comes out in 1980, it's a critical success, and in 1991 their investments from which there is return were those risky investments, or was this a cash cow by 1991? It would be foolish of me to say that there was no risk involved, but what I'm emphasizing to the Court is that there is no value. Whatever risk they took, they received a profit, and they made the business decision to take that risk. What I'm saying is that nothing that they spent in 1991 or 1995 or 2000 or 2005, for that matter, adds to the value of what Ms. Petrella may receive if she is sufficiently awarded any rights in this thing, because the only evidence before the Court in the form of the testimony of Mr. Sklizewski and the testimony of our expert both agreed that in order to generate any future revenue for Aging Bull, one is going to have to reinvest in the movie. One is going to have to spend money to make money, and that's because, for example, when the VHS cassette was released in 1996, as Mr. Sklizewski himself testified, and our expert said the same thing, you only generate money off of that release for about a six-month period of time. If you want to make future money off of that film, then you're going to have to reinvest, create a new format, such as, for example, when DVD was created. You're going to have to have a new marketing campaign, and you're going to have to spend money. After this date, regardless of how this case ends, if either side wants to make additional money off of Raging Bull, which would be negligible no matter what, they're going to have to assume a new risk. They're going to have to put up more money with the possibility that they may not return it. I've got it. I've got it. I've got it. Let's assume for the moment that you can get past this expectation prejudice. Can you speak for a moment about evidentiary prejudice? Absolutely. The issue, as I understand it... Excuse me. Excuse me. Hang on. I guess I should clarify the question to focus you. The issue, as I understand it, is when was the book published, and the evidentiary question goes to finding out when the book was published. I'm not sure there are any other serious factual questions to which the evidentiary privilege question goes, or evidentiary prejudice question goes. If I can assume your last statement is the only issue involved, when was the book published? Well, number one, there's no question the book was published in 1970. The question is when was the book written. When was the book written? Yeah, I misspoke. When was the book written? Yeah. Okay. Well, there is evidence before the court that raises a triable issue of fact, at least on the subject of when the book was written. I mean, obviously it was published... But how do you prove it? The question goes to the evidentiary prejudice. Well, I think the contents of the book... The fact that there's a factual dispute goes to whether summary judgment is appropriate, but the question is what is the source of evidence with respect to when the book was written? I would say there are two or three sources of evidence. I think the best evidence is the book itself. There are pictures in the book. There are passages in the book of events and situations that occurred and took place in the years up to 1969 and 1970. So obviously the book could not have been completed before those dates because there are pictures of movies that were made in those years. There are passages in the book itself which talk about events which occurred in 1969. I think that is one of the ways that we prove it. We also have in the book a recitation by Mr. Heller, who was the lawyer for both Mr. LaMotta and Mr. Petrella, who unfortunately again died within the 28-year period where Aubin would apply. Both a letter from him and statements in the book itself which corroborate that letter as to the origins and the sequence of events. We have documentary evidence here and we have the book itself, and I believe we can prove it, but we certainly can and have raised a tribal issue of fact. The book is clearly in evidence. I don't think there's any question of that. But tribal issue of fact isn't the issue with respect to prejudice. The question is, did the wait between 1991, when the cause of action became available after the Supreme Court decision, and the time the suit was filed, cause either deterioration of memory of people who are still living, or deaths of people who were living in 1991 who could have testified if the suit had been relatively properly. So the question is, what's the state of the evidence now? The question is, what prejudice do we have from the delay of time to the evidence that could have been presented? Okay, I will tell you this. There are three credited authors of the book. One is Mr. Petrella, who passed away in 1981. One is Mr. Carter, who passed away in 1982. And then there is Mr. LaMotta, who is still alive. Now, if you'd like me to address the subject of Mr. LaMotta, I'm happy to do so in his availability to testify. But the people who are still available to testify, unlike Danjack, where the Court noted that virtually every writer, producer, director, everyone was deceased in that case. In this case, other than Mr. Carter and Mr. Petrella, who died many years before this case could have been brought, everyone is still alive. Those people include the director of the film, Mr. Scorsese. Again, in Danjack, they noted the directors. All of the directors of the early Bond films were deceased. So what does Scorsese know about when the book was written? Well, you know what? Until we ask him, we're not going to know for sure. But he and Mr. De Niro, as you can see from the record before you, were involved in this project many years before it was actually made. They were very close personal friends of the parties who were involved, and no one sought to depose them. So I can't tell you precisely what he knows, but I can tell you that he was involved at an early stage, as was Mr. De Niro, and no one has sought to depose them, so it's speculation that they don't know something. I would also point out that the original screenwriters who received credit for the Raging Bull script on screen, that's Mr. Schrader and Mr. Martin, they are both still alive, and they could testify. Mr. De Niro is still alive. Mr. LaMotta is still alive. Joey LaMotta, who is his brother, who he was very close to and who was prominently depicted in the film, he's still alive. So again, today I'm concerned about summary judgment and raising triable issues of fact, but I will submit that there are many people still alive, that there has been no showing that this cannot be proven or addressed or established. There's just been no showing. And I think the trial court improperly shifted the burden to the plaintiff to show that everything was fine and that everybody, that these people could testify to these subjects. I think the burden is on the defendant, who is raising the last defense, to make that point, and I don't think they did. In fact, as you know, evidentiary prejudice in the moving papers below was raised in a single paragraph in a footnote, and the only notion was that Mr. LaMotta had trouble recognizing Ms. Petrella and distinguishing her from her mother from a couple years earlier. That was the only evidence of evidentiary prejudice in the moving papers. It wasn't until we got to the reply that other people were named, and of course the court even went so far as to name the absence of Mr. Petrella himself as evidence of evidentiary prejudice. This will, I don't know what to say about that because we couldn't have an Obam case if it were otherwise. Your time is pretty much up. I'll give you some, a little bit of time on rebuttal. Thank you, Your Honor. Good morning, Your Honor. My name is Jonathan Zabin. I'm representing the defendant's office. I'm here to speak on the case of Mr. Kulik. I'm going to deal specifically with the questions that Your Honor has raised and that Mr. Kulik discussed. First, the fact that this is an Obam case does not make any difference in terms of laches. Mr. Kulik is absolutely correct that an Obam case by definition arises 28 years after the work is created. We're not here discussing that 28 years. We're here discussing 18 years that passed that was purely the plaintiff's delay and inexcusable delay. She was simply waiting to see whether the film made a profit. That's what her testimony was. Now, let me make sure I got the law straight, that we're on the same page. Whether the delay is excusable or not, there's still no laches unless you can show prejudice. Is that correct? That's correct, Your Honor. We agree with that. Okay. Inexcusable delay is merely the first step. We absolutely agree with Your Honor that we must show either evidentiary prejudice or economic expectation prejudice. We think they both exist here. Going to the evidentiary prejudice first, Your Honor was quite right. The factual issues that would require testimony are as follows. First, which work came first? The 1960s Came first in the sense of when it was created? That's correct, Your Honor. Which work came first? The 1960s. What we call the 1963 screenplay or the 1970 book, which was copyrighted then. The authors in their agreement with MGM's predecessor specifically warranted and represent that the book was original and that the screenplays were based on the book. That was their signed representation of the work. Who wrote that language? I'm sorry, Your Honor? Who wrote the language that you're referring to? Who drafted the agreement? I don't know, Your Honor. That agreement was drafted back in the 1970s. That would be another question in the passage of time. It's contained in a document that's addressed to Mr. Petrella and Mr. LaMotta, which suggests to me that it was not drafted by them but rather by the other side. Everything about that document suggests it was drafted not by them but by the purchasers. Your Honor, I don't disagree that the likelihood is it was drafted by the purchasers. Where that information came from, however, I would suspect that it came from Mr. LaMotta and Mr. Petrella because there's specific language in there as to which was based on which. And there would be no reason for the motion picture producer to either know or care at that point about that language. That language, I'm sure, I can't be sure, I have every reason to think would come from the authors. In any case, that was their representation. Now the position we're in is trying to introduce evidence, or the plaintiff is, overturning that. We're stuck with the witnesses to that are either gone or can't testify. The witnesses, one witness that Mr. Kulik conspicuously didn't mention is the plaintiff's mother. She was the only person present other than Mr. LaMotta and Mr. Petrella when this book was written. She died in 2005. The plaintiff literally waited 14 years from 91 to 2005. Her mother died and she intentionally sues after that. So we have it. I have to say I'm somewhat skeptical of that. Realistically to expect that the mother would testify against the daughter's interest on this point, that strikes me as unlikely. Well, we'll never know how she would have testified, Your Honor, because she isn't available. Mr. LaMotta is 20 years older. He's now 90 years old. Well, we have a suspicion as to how she might testify based on the declaration of the plaintiff who says, as a girl, a young girl, my mom was typing every night, my dad was writing every day, they were working on the book. Now, of course, she was young at the time, but it's pretty clear that a child at that age would be able to know the mom was typing and the dad was writing. And obviously she grows up and even though she may or may not have known precisely what book it was, it's going to be in the family lore what they were working on at the time. Now, that's not necessarily very strong evidence, but it's evidence. But, Your Honor, even if it were that evidence, and I'll concede the point at the moment, the defendant would still be prejudiced by being unable to call witnesses to rebut it because there's the mother who could be cross-examined, there is Vicki LaMotta, who was the plaintiff's... Now, let me ask you about Vicki. What in the world would Vicki say? I mean, I read the chapter in her book that's put into the excerpts. She begins that chapter by saying, I hadn't seen Jake for a very long time. He calls me in 1976. And then she recounts the various episodes leading up to the making of the film and so on. But there's nothing in there that suggests that she knows anything about when that book was written. Your Honor, I think I might agree with you... Is there anything else that we know that she would know this? I'm sorry, I... Is there anything else that I should know that would suggest that Vicki LaMotta would have any evidence at all on the questions when the book was written? No, Your Honor, but she would have evidence on one other major fact that's in contention here. The plaintiff is questioning whether what's in the book is historic fact because obviously historic facts are not protectable. This book is almost entirely about the era where Vicki LaMotta was Jake's wife. To the extent there's any question raised, if this case goes back as to what historic fact was, Vicki LaMotta would be the key witness. And she's gone. She died in 2005. And the plaintiff waited. The plaintiff brought this case in 1991. Vicki LaMotta could have confirmed that all of the things in this book were indeed, as we assert, an historic fact and therefore not protectable elements and not infringable by the defendants. Well, we actually know something about that from the book that Vicki wrote as to what's historical fact and what's not. Your Honor, yes, there are other sources. But clearly under Danjack, as I understand this Court's decision in Danjack, it is not a question that all witnesses and all evidence has to be gone for there to be evidentiary prejudice. I think Danjack specifically says it's sufficient if some of the witnesses are no longer available because of the plaintiff's delay, that constitutes evidentiary prejudice. Your opponent, however — I'm sorry, Your Honor. Excuse me. This is Judge Zien, Ohio. Your opponent has just argued that there were, and I'm quoting, many people who are available to testify, including Mr. LaMotta. So assuming there are some people who are not available, are there not other people who could fill in the gap, so to speak, and in effect avoid any prejudice?  Mr. LaMotta is now 90 years old. The plaintiff testified that Mr. LaMotta did not recognize her, and this was a number of years ago, and that in her opinion he no longer had his faculties. Now, the plaintiff is trying to pretend she didn't testify to that or that somehow that isn't binding on the plaintiff. But it's clear that there's a difference between the testimony of a 70-year-old man — I'm somewhat close to 70, and I don't think I will be incapable of testifying. I hope I will not be in a few years, but I don't think I can readily say that of 90. And there's a difference between a 70-year-old man and a 90-year-old man and the passage of now 20 years of time. I realize my time is running out. Talk about the economic or the reliance damages. Obviously, what Dan Jack said is that if the copyright holder or the person exploiting it takes risk, continues to invest, there's economic expectation, regardless of whether that risk is successful. Let me frame the question a little more precisely. Counsel has suggested that given the three-year statute of limitations, their scope of damages would be limited only to the last three years prior to the time the lawsuit was filed. And there were investments made after the lawsuit was filed with the knowledge of the claim. So how is that factor into prejudice? Didn't the MGM take those risks into account? Your Honor, Dan Jack is very specific and unequivocal that latches depends not on what the defendant knows, but rather on the plaintiff's delay. And Dan Jack deals with this absolutely specifically, and I can quote the language that says that merely making a claim, claims are made all the time. And if the fact of making a claim put the defendant on notice, where if he did anything after that, he didn't have latches, there would never be latches in copyright claims. So the notice, at least under Dan Jack, is irrelevant. The investment has been continuing right up until as recently as 2005, 2006, MGM invested millions in bringing out a new edition of Raging Bull. The record shows that this film has earned approximately a million dollars a year in the three years preceding the district court's decision. This is a continuing investment, continuing investment in time, energy, money, and risk. And if I may, I don't deal with Grand Canyon for a moment, because I know the court was interested in discussing that. I think that's one of the three distinctions between Dan Jack and Grand Canyon. As I understand the facts in Grand Canyon, the court held that the lawsuit could have been brought in either 1985 or 1990 when plans number one and two were completed. And the delay was after that. There was no risk taken by Tucson Electric after the plan was completed. It just had the benefit of its investment. So there was no economic risk following the completion of the plan when the lawsuit could have been brought, unlike here where there was, I think the test record shows approximately $8.5 million has been expended by MGM. Admittedly, that is not the same amount as Dan Jack, but I hardly think the law depends, you know, that there's a bright line saying, you know, hundreds of millions gives you latches, 8.5 million doesn't. How much freedom does Dan Jack invite us to exercise in assessing degrees of risk? That is to say, some projects are very risky. Some projects have over a long period of time a great number of risks. Some projects are, well, in theory there's risk. It's not very risky at all. Now, by 1991, we have the completed film. It's been an enormous critical success, and it doesn't strike me that the investments in bringing out VHS and DVD and so on, it doesn't sound to me as though it's, I won't say it's not risky at all, but it certainly doesn't sound very risky. You have a valuable property on your hands. Everybody knows what the property is, and you're just exploiting it. Your Honor, I don't pretend, I won't pretend to complete expertise on this. My understanding, however, is there is no assurance that DVDs will sell on the store. You can manufacture half a million of them, and 400,000 of them can sit there or come back. There is considerable risk. It's not like going to Las Vegas, clearly, but there is considerable risk and considerable investment. And, Your Honor, How much risk is there by comparison to the risk that was at issue in Danjak? I would argue similar risk, Your Honor, because in Danjak, when they were making the later films, they had a known quantity. They had a tremendous franchise. They were investing in things that every reason to believe would net them a substantial return. There was still risk. One of those films could have failed, but certainly they had every much reason to believe in the success as MGM had when it invested more money in Raging Bull. How much did they invest in the DVDs? Is that the 20%? Between 1991 and the time of the deposition, I think the number was about $8.5 million, Your Honor. And of that, at least a substantial portion was more recently than that because there was a special edition DVD brought out in 2005, 2006. So it's some millions of dollars very recently. I don't know the exact number. Your Honor, what I'd suggest in terms of Danjak and Grand Canyon also is a case that we should consider goes back to Judge Lerner's hand, which is what Danjak relied on in 1916 in Haas v. Feist, where Judge Hand very specifically set forth that which has been followed by every court and every circuit in the country for the last almost 100 years, which is in the copyright context, a copyright holder cannot sit back and wait to see whether the film is a success because Judge Lerner's hand was faced with a very similar situation in Haas v. Feist and it's cited by Danjak because it's cited by every court in the copyright context. That if this, if Latches doesn't apply here, it is really very hard to see how this Court doesn't not only basically overturn Danjak, but overturn Judge Hand's decision in Haas v. Feist. Can I interrupt you with respect to your statement that every court has followed that? Are you familiar with Lyons Partnership decided by the Fourth Circuit in 2001? Not offhand, Your Honor, and if it didn't follow it, I stand corrected. That case says in the Fourth Circuit that there is no Latches in copyright infringement cases. Your Honor, I am not familiar with it, so I withdraw my statement. I mean, there's a circuit split on how Latches operates in copyright cases. Well, Your Honor, let me, if I may, limit my statement then. Certainly to the best of my knowledge, the Ninth Circuit, the Second Circuit, with which I'm familiar, have followed Haas v. Feist since 1916. I was not familiar with the Fourth Circuit case that Your Honor cited. We generally follow the Ninth Circuit in this Court. I'm sorry, Your Honor? We generally follow the Ninth Circuit in this Court. I understand, Your Honor. I was not saying that you're required to follow the Second. But in the Ninth Circuit, Your Honor, certainly this Court has followed it and cited it in Danjack. And this would, literally, to overturn it here would be to overturn Danjack. Yeah. Okay. You're over time. Well, I think I have 15 minutes. No, that counts up. Thank you, Your Honor. That's the problem. When it's read, it's counting. It's a digital grant of extra time, which we normally warn about. And nobody pays attention to it even then. So I'll give you two minutes to ---- Thank you. I know my client would want to remind the Court that she did not wait until this movie showed a profit to file this suit. It's just one of the things they keep saying over and over again. It's not true because, according to them, there has never been a profit. But she didn't know that. Of course, we had the profit statements. Yes, we did. Yes, we did. There was never an intent. She didn't know as she waited that it was not making a profit. Yes, she was getting profit participation statements for a period of time. In any event, on the subject of the investment, I think there's a very important point that I don't want to be missed. The defendants were given two chances at deposition and in declaration to say that they would have done something different had this suit been filed earlier, 10 years earlier, 15 years earlier. But what they said was they were unable to identify anything they would have done differently. If they can't tell this Court, after all this time, that they would have done something differently had this suit been filed 15 or 20 years earlier, then it is disingenuous of them to come to the Court and say they made an investment because the evidence is clear they were going to make that investment anyway. When they were on notice in 1998 of the infringement, they ignored Ms. Petrella. They wrote her a couple of self-serving letters and they went on, according to their own testimony, doing exactly what they wanted to do. When this lawsuit was filed in January of 2009, they went on and did exactly what they wanted to do. They weren't impacted by the suit. Let me interrupt you for a second. If I can interrupt you for a second. This is Judge Zee again. Her lawyer at that time was sending threatening letters and making no change in her position with respect to filing a lawsuit, even though she threatened a lawsuit and threatened repercussions if they didn't agree with her. So that argument cuts both ways. Well, Your Honor, but again, I'm addressing it in terms of prejudice. I agree there was a delay, and we have laid out for you how in real human terms why the delay occurred. I understand the Court may conclude that that's not legally sufficient despite her reasons. But in terms of prejudice, what I'm saying is there can be no prejudice based on the fact that they took the risks of an investment when the evidence is clear they were going to take that risk anyway because they've said so. They have had two chances in deposition and declaration to tell us, you know what, if this suit had been filed 15 years earlier, we wouldn't have made these investments. We wouldn't have taken this risk. Well, that's not quite what they said. Mr. Slizewski said that it's speculative what would have been done if the threats that were made earlier were actually brought to the fore and they were staring complex litigation in the face. But they were staring that complex litigation in the face in 1998 through 2000, and they were staring it in the face again from January 2009 to the present, and they did nothing. Wait a minute. From the date the suit was filed to the time that Mr. Slizewski's deposition was taken, that was nine months, wasn't it? It was. What, do you expect them to turn on a dime and stop? Well, I don't know that there was anything going on in the year 2009. I just know that what Mr. Slizewski testified in his deposition is that nine months after this lawsuit was filed, or however many months it was, he had not been instructed nor had he done anything different with regards to filing of this suit, just as he had done nothing different from 1998 to the present. Speculation or not, they could have in their declaration said we might have done this or we might have done that, but given all these chances to tell this court that they would have done something differently had the suit been filed 15 years earlier, they said nothing, and I submit that they wouldn't have done anything differently because they always think they're right and they always think they're going to win, and they went ahead, business as usual, and they knowingly assumed the risks. Okay. We've taken a look at that record, and we appreciate your comments about it. Okay. Time out. Time out. You're over time. Let me ask, does this dispute ever reach a mediation stage? It did. And I take it it didn't work. It did not work. Okay. All right. Well, does that mean it would not profit, excuse me, I have this voice problem, or would it profit the parties to take another look at mediation? Your Honor, I'm always willing to mediate a dispute, but I've been representing plaintiffs in litigation with companies like these for many, many years, and I find the process usually to be a pointless one, but if the court feels that we should engage in another one, I'm certainly happy to do it. Okay. Well, we'll think about that. All right. Thank you. Thank you. Thank you. The case is submitted. Thank you for your argument. Interesting case. And we are in adjournment.
judges: Zouhary, Fletcher, Fisher